IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| STANLEY BOCLAIR, | ) |
| Plaintiff, | ) ) ) |
| v. | ) )  Case No.   18-cv-1188-RJD |
| JACQUELINE LASHBROOK, et al., | ) ) ) |
| Defendants. | ) |

**ORDER**

**DALY, Magistrate Judge:**

Plaintiff Stanley Boclair, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging his constitutional rights were violated while he was incarcerated at Menard Correctional Center ("Menard"). In his complaint, Plaintiff alleges he was subjected to cruel and unusual punishment when members of the Orange Crush tactical unit handcuffed him in a stress position on August 4, 2017, causing severe pain and injuring his left shoulder. In his Amended Complaint, Plaintiff proceeds on ten counts alleging deliberate indifference under the Eighth and Fourteenth Amendments against Defendants John Baldwin, Jacqueline Lashbrook, Barry Myers, Michael Laminack, Philip Royster, Joshua Cornstubble, John Koch, Justin Engelage, Carson Winters, and Ezra Hunter (*see* Doc. 63). Each count is against one individual defendant.

This matter is now before the Court on Defendants' Motion for Summary Judgment (Doc. 242), to which Plaintiff responded (Doc. 250), and Defendants filed a Reply (Doc. 258). Plaintiff filed a Motion to Strike Defendants' Reply. Doc. 259. He references a procedure for filing replies that was ordered by Judge Yandle, who was previously assigned to this case. Doc. 131.

The undersigned does not require the same procedure, and therefore Plaintiff's Motion to Strike is DENIED.  As explained further, Defendants' Motion for Summary Judgment is GRANTED.

## MATERIAL FACTS

At his deposition, Plaintiff testified that he suffered a left shoulder injury from a fall that occurred at a prison in either late 2014 or early 2015.  Doc. 266-1, p. 4.  *Id*.  When he arrived at Menard in 2016, he had no pain or complications from his left shoulder.  *Id*., p. 8.  He did not have a special cuffing permit when he arrived at Menard, nor did he obtain one at Menard at any time before the incident at issue.  *Id*., p. 5.

According to an IDOC Operations Order, the IDOC Southern Region Tactical/Tactical Response Team planned to search for weapons, weapon material, security threat group literature, and drugs at Menard Correctional Center at some point between August 1, 2017 and August 5, 2017.  Doc. 250, p. 28.  The memo states that "the Offenders will be strip searched and restrained. They will then be escorted to the General Division Chapel and monitored by tactical staff with medical staff present for any health issues."  *Id*.

On August 4, 2017, Defendant John Baldwin was the Acting Director of the IDOC.  Id., p. 41.  Defendant Lashbrook was the warden at Menard.  Id., p. 54.  Defendant Engelage was a member of the tactical unit team on August 4, 2017.  Id., p. 67.  Defendants Royster, Myers, Winters, Cornstubble, Hunter, Koch, and Laminack were correctional officers in various capacities who were present at Menard on August 4, 2017 and participated in some capacity in the search. Id., pp. 27, 78, 86, 97, 105, 114, 124, 126,

Defendants Hunter and Engelage stated in their sworn answers to Interrogatories that "protocol requires individuals in custody to be restrained behind their back unless they produce a medical permit requiring a different method of restraint[]."  *Id*., pp. 62, 86.  Defendant Engelage

further stated that "the main objective in securing large groups of individuals in custody during prison shakedowns is to keep the area safe and secure by making sure nothing gets out of hand, too loud, or too rowdy."  *Id*., p. 68.

On the morning of August 4, 2017, Plaintiff and other inmates learned "that the prison was on lockdown and a shakedown was imminent."  Doc. 266-1, p. 3.  After "some hours went by", officers arrived at Plaintiff's gallery and started "preparing" him for the shakedown."  *Id*., p. 4.  The officers told him to turn with his back towards them, and they performed a strip search.  *Id*., p. 6.  An unknown corrections officer handcuffed Plaintiff behind his back.  *Id*., p. 7. Plaintiff was led out of his cell to the chapel, which he described as follows:

> I was told to back out of the cell, head down, facing the ground. And once I backed out of the cell, I was turned a certain way and proceeded down the gallery with my head down, behind another officer.  Between each officer and an inmate, there was an officer. There was hundreds of officers escorting the whole gallery at one time.  Each inmate on either side of me, we had an officer between us.  An officer would be behind me; an officer would be in front of me.  We proceeded out the door of the cell house, and we proceeded to the chapel, and in that same order.  We were assigned a row of seats to sit in.

*Id*., p. 7.

In his sworn answers to Interrogatories, Defendant Royster stated that "generally, individuals' head and eyes are down while being transported so they do not trip and fall."  Doc. 250, p. 38.  Defendant Winters stated in his sworn answers to Interrogatories that inmates "are moved with their head and eyes down" so "they cannot see other inmates in order to start a fight or target an officer."  *Id*, p. 128.

As Plaintiff walked out of his cell, he saw Defendant Lashbrook.  Doc. 266-1, p. 7.   He recognized her because he had previously seen her walking around Menard.  Id.   Regarding the

Page **3** of **9**

other defendants, "I didn't know any of them by face. If I saw their face, I couldn't put a name to it; and if I heard their name, I couldn't put a face to it. I had no familiarity with the officers or with the staff on August 4, 2017." Id.

Plaintiff sat in his assigned seat. He explained that he was in a "stress position" because he had "to have [his] extremities and [his] limbs held in a certain fashion for a certain length of time until it starts to put stress on [his] extremities…[and] body." Id, p. 9. Plaintiff was in the chapel for approximately 90 minutes. He stayed seated and handcuffed behind his back the entire time. Id. He saw Defendants Royster and Engelage, and he heard the names "Ezra..Carson..Laminack…Cornstubble." *Id*., p. 10. He never heard nor saw Koch or Myers. Id.

Plaintiff spoke to Defendants Winters, Royster, and Hunter. Id., p. 11. When asked what he told them, Plaintiff testified to the following:

> I had an injury to my shoulder, that it was being torn, that I felt it being torn. The word I used was "rip." I said, my shoulder is being ripped apart. I've been here for more than an hour now or a little into the hour. I've been there more than 30 minutes now. I'm starting to feel the pain, I'm starting to feel the stress. It's pulling my shoulders. I'm grimacing. I had a face full of tears. I'm trying to get them to do something.
>
> It wasn't-it wasn't a long thing. These were just things that happened over a matter of second verses, two or three times. They knew I was in pain. They came and talked-they addressed me. I didn't know who they were, but they addressed me in a two or three second verse, when I said-you know, when they said—it was all they said—it won't be that long, it won't be that long, it won't be much longer.

Id., p. 11. Some of the inmates who had braids in their hair were uncuffed and lined up against a wall so that they could undo their braids. Id., pp. 10, 11. Plaintiff overheard "someone say that Defendant Lashbrook was in the chapel" while he was crying, grimacing, and asking for medical

attention.  Id., pp. 12, 13.  Plaintiff did not talk to Defendants Baldwin or Lashbrook.  *Id*., p. 13. He never saw Defendant Baldwin, but believes Defendant Baldwin was present at Menard on August 4, 2017.  *Id*.

Plaintiff produced an affidavit from another inmate, Roberto Ramirez, that states as follows:

> …we went to the chapel for a major shakedown and I looked behind me and saw and told Boclair Warden Lashbrook was behind us when he was in the chair beside me crying to staff about his shoulder being messed up.  This was in 2017.  I don't remember the date or month.  We sat next to each other for over an hour staff kept saying it would not be long.  He got no medical that I know of.

Doc. 250, p. 131.

Following this incident, Plaintiff had severe shoulder pain.  Doc. 266-1, p. 5.  He underwent shoulder replacement surgery in April or May 2018.  *Id*. The surgery significantly helped his pain and discomfort.  *Id*.

**Analysis**

The Eighth Amendment "'does not mandate comfortable prisons,' but neither does it permit inhumane ones."  *Brown v. Osmundson*, 38 F. 4th 545, 559-60 (7th Cir. 2022) (internal citations omitted).  To succeed on his deliberate indifference claims against each Defendant, Plaintiff must "provide evidence, either direct or circumstantial" that shows (1) "he had an objectively serious medical need" (2) "which [the defendant] "[knew] of and disregard[ded] a substantial risk of harm."  *Id*. at 550.  Negligence or even recklessness does not constitute deliberate indifference; the defendant must have shown "something approaching a total unconcern for the prisoner's welfare in the face of serious risks."  *Id*.

Regarding the first element, the evidence reflects that there is a genuine issue of material

fact regarding whether Plaintiff was suffering from an objectively serious medical need on April 4, 2017. Construing the evidence in the light most favorable to Plaintiff, he was grimacing and crying from shoulder pain, and telling correctional officers that it felt like his shoulder was ripping apart.

As to whether the defendants knew of and disregarded a substantial risk of harm to Plaintiff as he sat in the chapel, the Court first considers Plaintiff's interactions with Defendants Winters, Royster, and Hunter. He told Defendants that he was in severe pain. By crying and grimacing, he was showing visible signs of pain.

Significant to this analysis, however, is the circumstances of the situation. The prison was on lockdown. The cells in Plaintiff's gallery were being searched by the Tactical Response Team. Plaintiff and the other inmates in his gallery were being held in the chapel. The record reflects that most of the inmates (except for the ones who were unbraiding their hair) were cuffed behind the back. Apart from Plaintiff's subjective complaints and signs of distress, Defendants Royster, Winters and Hunter had no reason to think that being handcuffed behind the back was more uncomfortable for Plaintiff than any of the other inmates who were waiting in the chapel. He had no permit to avoid cuffing behind the back, nor were Defendants aware of his prior shoulder injury. Defendants followed protocol by cuffing him behind the back.

The Court recognizes that a prisoner's subjective complaints of pain and outward signs of distress (e.g., crying and grimacing) often create a genuine issue of material fact when state actors do not attempt to alleviate the prisoner's pain. In a different setting, a refusal by correctional officers to uncuff or otherwise take some action to alleviate the pain of a crying, distressed prisoner could be considered deliberate indifference. Here, however, the evidence and all reasonable inferences from it do not reflect that Plaintiff was subject to "wanton and unnecessary infliction of

pain." *Gruenberg v. Gempeler*, 697 F.3d 573, 579 (7th Cir. 2012). The prison was in a state of heightened security. Plaintiff was one of many inmates in the chapel, and Defendants' primary objective was to keep everyone in the chapel safe.

The interactions between Plaintiff and Defendants Royster, Hunter, and Winters were brief. When Plaintiff informed Defendants that he was in significant pain, they told him that "it would not be much longer." This response does not reflect a total disregard for Plaintiff's welfare. At most, the record reflects that Defendants neglected Plaintiff in a few brief interactions over the course of a 90-minute period. These instances, whether considered "alone or collectively[,] cannot support a finding of deliberate indifference." *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997).

Having found that there is no genuine issue of material fact regarding whether Defendants Royster, Hunter, and Winters (who had the most contact with Plaintiff) were deliberately indifferent to Plaintiff's condition, the same finding is appropriate for the remaining Defendants. Plaintiff testified that he saw Defendant Engelage in the chapel, and heard the names "Laminack" and "Cornstubble." He also heard that Defendant Lashbrook was present while he was crying. He neither saw nor heard Defendants Koch or Myers. Considering the number of inmates and officers involved in the shakedown that day, it is unreasonable to infer that Defendants Lashbrook, Koch, Myers, Laminack, Cornstubble, and Engelage were aware of Plaintiff's condition simply because they were in his general vicinity. With no evidence to suggest Defendants Lashbrook, Koch, Myers, Laminack, Cornstubble, and Engelage were even aware of Plaintiff's condition, no genuine issue of material fact exists regarding whether they were deliberately indifferent to him.

Plaintiff argues a genuine issue of material fact exists regarding whether Defendant Lashbrook is subject to supervisory liability in this case. While there is no *respondeat superior*

liability in §1983 cases, a supervisor can be liable for the conduct of others if she knew about the conduct, and "facilitated, approved, condoned, or turned a blind eye" to a Constitutional violation. *Kemp v. Fulton Cty.*, 27 F. 4th 491, 498 (7th Cir. 2021). As explained above, the record reflects that while Defendants Royster, Hunter, and Winters were, at most, negligent in their response to Plaintiff's complaints, nothing in the record supports a finding that Plaintiff's Eighth Amendment rights were violated. Therefore, no evidence suggests that Defendant Lashbrook condoned or turned a blind eye to a Constitutional violation.

Finally, Plaintiff argues that Defendant Baldwin, as Director of the IDOC, is liable for instituting a policy of "injuring and punishing inmates during shakedowns by the practice of long periods of being handcuffed behind the back and ordered to hold head and eyes downwards in stressful stationary positions." In a §1983 *Monell* claim, the plaintiff must prove that his Constitutional rights were violated by either an express or implied policy. *Howell v. Wexford Health Sources, Inc*., 987 F.3d 647, 653 (7th Cir. 2021) (*citing Monell*, 436 U.S. at 690-91. Because the evidence taken in the light most favorable to Plaintiff does not indicate his Eighth Amendment rights were violated, no reasonable jury could find Defendant Baldwin is liable for an express or implied policy that caused those rights to be violated.

### Conclusion

Having found that no genuine issue of material facts exists regarding whether Defendants violated Plaintiff's Eighth Amendment rights on August 4, 2017, summary judgment is granted in favor of Defendants and against Plaintiff. Plaintiff's claims are DISMISSED WITH PREJUDICE. All pending motions are DENIED AS MOOT. The Clerk of Court is directed to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

**DATED: March 28, 2024**

                                                 *s/ Reona J. Daly*
                                                 **Hon. Reona J. Daly**
                                                 **United States Magistrate Judge**